# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

VETERINARY PHARMACEUTICALS,
INC., a California corporation,

       Plaintiff,

vs.                                                                                    Civ. No. 03-00838 MV/LCS

STEVEN M. PUGLIESE, an individual;
ADVANCED SKIN TECHNOLOGIES,
INC., a Pennsylvania corporation; SASHA
TRUDNOWSKI, an individual; LINDA
TRUDNOWSKI, an individual; and ERIN
FERKETICH, an individual,

       Defendants.

_____

STEVEN M. PUGLIESE

       Counterclaimant,

vs.

VETERINARY PHARMACEUTICALS,
INC.,

       Counterdefendant.

_____

STEVEN M. PUGLIESE

       Third Party Plaintiff,

vs.

DANIEL L. RUDNICK,

       Third Party Defendant.

_____

AST WEST, INC.,

        Plaintiff,

vs.                                      Civ. No. 04-01369 MV

VETERINARY PHARMACEUTICALS,
INC., a California corporation, and
DANIEL RUDNICK,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff Veterinary Pharmaceuticals, Inc.'s

Motion for Partial Summary Judgment as to Liability Regarding Veterinary Pharmaceuticals,

Inc.'s Conversion and Fraud Claims, and Motion for Summary Judgment as to all Counterclaims

and All Third Party Claims, filed October 1, 2004, **[Doc. No. 76]**.  The Court, having considered

the motion, briefs, relevant law and being otherwise fully informed, finds that the motion is well-

taken and will be **GRANTED**.

## FACTUAL BACKGROUND

In June 2002, Plaintiff/Counterdefendant Veterinary Pharmaceuticals, Inc., ("VPI")

entered a Total Output and Exclusive Dealing Agreement (the "Agreement") with AST West,

Inc., ("AST West"), an entity owned and operated by Defendant/Counterclaimant/Third Party

Plaintiff Steven M. Pugliese ("Pugliese"), in which AST West agreed to manufacture certain dairy

sanitation products ("Products") from raw materials provided by VPI and then to provide all of

the Products exclusively to VPI.  Pugliese and Defendant Advanced Skin Technologies, Inc.,

("Advanced Skin"), a Pennsylvania corporation owned and controlled by Pugliese, also signed the

Agreement.

The recitals to the Agreement state that "AST intends to enter a total output and exclusive dealing agreement with VPI, whereby AST will produce and manufacture the Product(s) and VPI will be the sole customer of AST for the Product(s)" and that "VPI intends to sell the Product(s) manufactured by AST to Customers and, to provide compensation to AST" in accordance with the Agreement.

The Agreement provides that AST will "sell any and all output of the Product(s) solely to VPI and to no other individual(s) or entity(ies)."  In return, VPI agreed to "purchase from AST all of AST's output of the Product(s)."   VPI was responsible for purchasing supplies for the Products and providing them to AST.[1]  Until VPI was reimbursed for the cost of supplies by deducting the cost of the supplies from gross sales revenue, the supplies remained "the sole and exclusive property of VPI."  AST agreed to store the inventory of supplies, without charge to VPI, until used in the production and manufacture of the Product(s).  The Agreement required AST to maintain strict inventory control of any and all supplies purchased by VPI, some of which were classified chemicals under federal law, and to use its best efforts to assist and cooperate with VPI upon reasonable request to maintain strict inventory control.

In return for manufacturing the Products, VPI agreed to pay AST one-half of the gross profits on all Product(s) sold and delivered to customers.  Gross Profits are defined as "Gross Sales Revenue of VPI during each calendar month, less actual Costs of Goods Sold on a per unit

---

[1]  The Agreement provides that VPI will reimburse AST West for all supplies owned by AST West that were physically present in AST West's inventory on the effective date of the Agreement.  The parties dispute whether VPI timely complied with this provision.  This factual dispute, however, is immaterial to the Court's analysis.

3

basis."

Beginning in August 2002--just two months after the Agreement was signed, AST West began selling Products manufactured from supplies provided by VPI to third parties without VPI's knowledge and keeping the proceeds.  From August 2002 to June 2003, AST West made at least fourteen shipments of Products to third parties.  The proceeds from at least ten of these sales were deposited in Pugliese's personal bank account and at least one payment was deposited into Advanced Skin's bank account.

VPI made repeated requests for a full inventory of its supplies and Product stored and maintained at AST West's production facility, including records of any and all manufacturing activities.  For months, AST West provided VPI with incomplete inventory reports.  To conceal AST West's sales of Products to third parties, Pugliese directed AST West employees to destroy certain records, including batch records that showed the amount of raw materials used to make batches of Products.  Pugliese also had falsified batch records created and provided to VPI.

At some point VPI began to suspect that AST West may not be complying with the terms of the Agreement and stepped up its attempts to reconcile supply and Product inventories.  In furtherance of these efforts, VPI requested a full inventory of the supplies and Product stored at AST West.  In response to these requests, Pugliese signed the following written statement under threat of perjury:

> I, Steve Pugliese, individually and as President of AST West, Inc., hereby certify that on June 9, 2003 I sent Veterinary Pharmaceuticals, Inc. each and every batch record reflecting any and all manufacturing activities, from June 2002 through May 30, 2003, organized by month, for products manufactured at AST West, Inc. in accordance with the Total Output and Exclusive Dealing Agreement.  I certify that I have checked the accuracy of these records.  Double checked the accuracy of these records and can confidently confirm to Veterinary Pharmaceuticals, Inc. that

4

such records represent the totality of any and all batch records for products manufactured under the Total Output and Exclusive Dealing Agreement.  I have cross checked these batch records with the AST West, Inc. quality control book and have utilized all the resources available to me to insure that I have produced in an organized fashion all the batch records referred to herein above.

Brian Wayne Fenton, one of AST West's employees, was asked by Pugliese to pull the batch records to attach to this written statement.  Fenton stated in deposition testimony that Pugliese specifically requested that Fenton not include batch records for Products delivered to third parties and that Fenton create false batch records to account for the supplies used to make Products delivered to third parties.

VPI calculated that 363 pounds of hydriodic acid were unaccounted for in the batch records provided by Pugliese.  Hydriodic acid, which is used to manufacture methamphetamines, is classified by federal law as a List I chemical.  VPI, who knew that Pugliese had a prior felony conviction for participating in a conspiracy to traffic in illegal narcotics, became concerned that the classified chemicals purchased by VPI and delivered to AST West might be entering the illegal drug market.  Daniel Rudnick, VPI's Vice President and General Counsel, immediately notified agents at the Drug Enforcement Agency ("DEA") that Pugliese and AST West could not account for approximately 363 pounds of hydriodic acid.  In a letter to DEA Agent Wes Manning dated July 7, 2003, Rudnick provided the names of key people at VPI and AST West, asserted that all the materials and supplies used to make the Products were VPI's property, and provided information regarding a suspected shipment to a third party:

In summary, we have 84 unlabeled barrels of what we strongly believe is iodine teat dip or teat dip concentrates, heading south for the border on a truck we have no record of.  The lack of a batch record is a clear attempt to cover up the fact the product was manufactured.  Mr. Pugliese is currently in dire financial straights and we believe he is knowingly trafficking in products stolen from us and regulated by

the FDA and DEA.  These products are crossing state lines and perhaps
international borders.  It appears he has also taken steps to kick over the traces by
eliminating the batch record.

We want to get to the bottom of this ASAP.  As we discussed, the iodine and
hydriodic acid are common chemicals used by the meth cookers.  We do not know
if these bad guys are getting their hands on these products.  But, we do know
Mr. Pugliese has caused us to lose track of them and we have no idea where they
may end up or in what ultimate chemical form.  We need your agency's help.

In a letter dated July 8, 2003, Rudnick informed the DEA that he had received information

that a truck load of unauthorized Product was being manufactured and packaged for shipment to

a company named S & S Dairy Supply:

The information we have today is that Mr. Weems [the owner of S & S Dairy
Supply] has gone around our salesmen and the office in Hanford and is dealing
directly with Steve Pugliese in placing these unauthorized orders.  Mr. Pugliese is
knowingly and deliberately stealing our property and Mr. Weems is knowingly and
deliberately receiving stolen property in Interstate Commerce. . . . We need to
coordinate between law enforcement agencies to catch these guys squarely in the
act of perpetrating these crimes.  Please advise what law enforcement agencies in
Texas and New Mexico I should contact so the seller and the buyer of our stolen
property can be apprehended.. . . In advance, that [sic] you very much for your
anticipated cooperation in helping us bring this den of thieves to justice.

On July 10, 2003, Rudnick sent DEA Agent Manning a letter that described how

hydriodic acid was used in the dairy sanitation products manufactured by AST West for VPI, and

enclosed the June 12, 2003 Affidavit of Steve Pugliese and the AST West batch records.  The

letter stated, in part, that:

Hydriodic Acid is a List One chemical which is a direct precursor for the
manufacture of methamphetamine.  By all the records provided to us by
Mr. Pugliese via a sworn affidavit under penalty of perjury we have calculated a
net loss of this raw material of 2,363 #'s.  This, among other things going on at the
plant is absolutely scaring us to death.  I have started coordinating with Eric
Hansen in Las Cruces.  Mr. Hansen told me that you probably would not be
available till Wednesday, July 16, 2003 to inspect the plant, its records and
question the people there.  I am available to help every law enforcement agency

that needs me to be in New Mexico or Texas.  I am making plans to be available for Mr. Hansen and the FBI if the FBI agrees to get involved beginning Sunday evening and all next week.

Please tell me how I can help you get to the bottom of the missing Hydriodic Acid.

On that same day, Rudnick faxed a letter to DEA Agent Hansen that stated:

2,363 pounds of missing Hydriodic Acid is a huge problem.  We need to coordinate all possible law enforcement agencies to find out where this List One Chemical went and why the records at the plant together with all other purchasing records show this shocking shortage.

If our inventory analysis is accurate (we know there was no begging [sic] inventory, we have verified and cross checked with H & S Chemical exactly how many pounds of product was purchased and we have factored in all the batch records where the Hydriodic Acid is used together with the physical inventory provided to us by AST West on or about May 29, 2003 and we have calculated a net shortage of 2,363 pounds).  We should all be asking ourselves where did it go, who received it, for what purpose, etc. etc.  This looks like a meth cookers [sic] dream.

Later that day, Rudnick faxed DEA Agents Hansen and Manning corrected versions of these letters reducing the amount of missing hydriodic acid to 363 pounds.

The DEA subsequently executed a search warrant at AST West's production facility.  As part of the search, DEA agents interviewed Pugliese about the missing hydriodic acid.  During this interview, apparently to assuage DEA suspicions that he was selling raw chemicals to drug producers, Pugliese admitted to making shipments of Product to third parties.  At the conclusion of this search, the DEA determined that all chemicals were fully accounted for, either in the inventory of supplies and Product stored at AST West's production facility or in Product manufactured and shipped to third parties.

On July 17, 2003, VPI filed a complaint against AST West, Pugliese, and Advanced Skin,

alleging breach of contract, conversion, and fraud.  Seven days later, AST West filed for bankruptcy, thereby creating an automatic stay of any further proceedings against AST West. VPI subsequently dismissed AST West from this proceeding without prejudice and filed an Amended Complaint dropping the breach of contract claim and asserting conversion, fraud and constructive trust claims against Pugliese, and conspiracy to commit conversion and conspiracy to commit fraud claims against all defendants.  Pugliese filed a counterclaim against VPI asserting breach of contract, bad faith, defamation, and *prima facie* tort.  Pugliese also filed a third party complaint against Third Party Defendant Daniel L. Rudnick asserting civil conspiracy, defamation, and *prima facie* tort.  In the instant motion, VPI seeks partial summary judgment on its conversion and fraud claims against Pugliese and VPI and Rudnick seek summary judgment on all counterclaims and third party claims brought against them by Pugliese.

## **LEGAL STANDARD**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Jones v. Kodak Medical Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999).  Under Rule 56(c), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248.

Initially, the moving party bears the burden of demonstrating the absence of a genuine

issue of material fact.  *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir.

1993).  There is no requirement that the moving party negate the nonmovant's claim.  *See Celotex*

*Corp. v. Catrett*,  477 U.S. 317, 325 (1986).  Once the moving party meets its burden, the

nonmoving party must show that genuine issues remain for trial "as to those dispositive matters

for which it carries the burden of proof."  *Applied Genetics Int'l Inc. v. First Affiliated Secs.,*

*Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1991) (citations omitted).  Rather than "merely show there is

some metaphysical doubt as to the material facts," the nonmoving party is required to "go beyond

the pleadings and, by affidavits or depositions, answers to interrogatories, and admissions on file,

designate specific facts showing there is a genuine issue for trial."  *Kaus v. Standard Ins. Co.*, 985

F. Supp 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998).  There is no issue for

trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict

for that party.  *See Anderson*, 477 U.S. at 248.   Upon a motion for summary judgment, the Court

"must view the facts in the light most favorable to the nonmovant and allow the nonmovant the

benefit of all reasonable inferences to be drawn from the evidence."  *Kaus*, 985 F. Supp at 1281.

## DISCUSSION

A.    Conversion Claim

VPI contends that Pugliese, by selling Products manufactured from supplies provided by

VPI to third parties, committed conversion.  Under New Mexico law, conversion is "the unlawful

exercise of dominion and control over property belonging to another in defiance of the owner's

rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful

detention after demand has been made."  *See AAA Auto Sales & Rental, Inc. v. Security Fed. Sav.*

*& Loan Ass'n.*, 114 N.M. 761, 763, 845 P.2d 855, 857 (Ct. App. 1992) (quoting *Nosker v. Trinity*

*Land Co.*, 107 N.M. 333, 337- 38, 757 P.2d 803, 807-08 (Ct. App. 1988).  When a person having possession of another's property treats the property as his own, whether he uses it, sells it, or discards it, he is using the property for his own purpose.  *See* UJI 14-1641 NMRA 2002 (conversion means "using another's property for one's own purpose [rather than] . . . for the purpose authorized by the owner"); *see also Newman v. Basin Motor Co.*, 98 N.M. 39, 42, 644 P.2d 553, 556 (Ct. App. 1982) (conversion is, among other things, the unconsented exercise of dominion over a chattel to the exclusion or in defiance of the owner's right thereto).

It is undisputed that Pugliese and AST West sold Products manufactured with supplies owned by VPI to third parties.[2]  Pugliese contends, however, that VPI did not own the Products AST West sold and, therefore, there can be no conversion.  VPI, on the other hand, asserts that Pugliese and AST West were merely bailees who obtained no ownership interest in the Products. The law supports VPI's position.

A bailment is the delivery of goods or personal property by one person to another in trust for a particular purpose, with a contract, express or implied, that the property shall be returned once the purpose has been faithfully executed.  *See* Black's Law Dictionary 129 (6th ed. 1990); 8 Am. Jur. 2d *Bailments* § 2 (1980).  Traditionally, bailment transactions have included delivery of goods or personal property that are returned to the bailor in the same form in which they were

---

[2]  The Agreement provides that VPI will purchase the supplies and that the supplies "shall be the sole and exclusive property of VPI" until VPI is reimbursed for the supplies pursuant to Section 9 of the Agreement.  Section 9 provides that VPI will be reimbursed for purchases of supplies by deducting these costs on a per unit basis from gross sales revenue.  Thus, it is clear that the supplies are owned by VPI until the Product manufactured from the supplies has been sold, payment received by VPI, and profits distributed for that sale.  Furthermore, the parties have stipulated that "VPI purchased and owned all of the Supplies which [sic] were transported to and stored at AST West's Production Facility."  Pre-Trial Order at ¶ 16.

10

delivered.  As a result of the increasing complexity of commercial relationships, however, the law

of bailments has expanded to include many new and varied transactions.  Among these

transactions is the bailment of incomplete goods for the purpose of having the bailee manufacture,

repair, or otherwise improve them.  This type of bailment is recognized in Section 21 of American

Jurisprudence 2d, which states:

> Where property in an unmanufactured state is delivered by one person to another
> to be manufactured or improved, whether the transaction constitutes a sale or a
> bailment depends generally upon whether the product of the identical articles
> delivered is to be returned to the original owner, even though in a new form. If it is
> so to be returned, it is a bailment and title does not vest in the manufacturer, but if
> the manufacturer may deliver any other product of equal value it is a sale and title
> vests in the manufacturer. If a transaction may be classified as a bailment under the
> foregoing rule, its status is not changed by the fact that the agreement provides for
> a sale of the completed articles by the bailee, on account of the person furnishing
> the raw materials, and for a division of the proceeds.

8A Am. Jur. 2d *Bailments* § 21 (1980);  *see also* 1 C.J.S. *Accession* § 3 (2005) ("The general rule

is that, where a person furnishes materials from which a product is to be manufactured for his or

her benefit, the title is in him and not in the manufacturer.").

As stated by the United States Supreme Court,

> [T]he question of [whether a transaction constitutes a] bailment or not is
> determined by whether the identical article delivered to the manufacturer is to be
> returned to the party making the advance. Thus, where logs are delivered to be
> sawed into boards, or leather to be made into shoes, rags into paper, olives into
> oil, grapes into wine, wheat into flour, if the product of the identical articles
> delivered is to be returned to the original owner in a new form, it is said to be a
> bailment, and the title never vests in the manufacturer. If, on the other hand, the
> manufacturer is not bound to return the same wheat or flour or paper, but may
> deliver any other of equal value, it is said to be a sale or a loan, and the title to the
> thing delivered vests in the manufacturer.

*Laflin & Rand Powder Co. v. Burkhardt*, 97 U.S. 110, 116 (1877).  Accordingly, in order for the

instant transaction to constitute a bailment, the final product must be composed of the identical

11

property originally delivered.  *See, e.g.*, *id.*; *Gleason v. Beers' Estate*, 59 Vt. 581, 10 A. 86 (1887)

(a bailment is created when logs are delivered at a custom sawmill to be manufactured into lumber

at an agreed compensation);  *First Nat. Bank v. Kilbourne*, 127 Ill. 573, 20 N.E. 681 (1889)

(bailment existed when dairymen provided milk to owner of cheese factory to convert into butter

and cheese, sell the butter and cheese, and then remit proceeds minus factory owner's

compensation to dairymen);  *Stewart v. Stone*, 127 N.Y. 500, 28 N.E. 595 (1891) (bailment

created when plaintiff provided milk to defendant to manufacture into cheese and butter, sell the

cheese and butter, and distribute the proceeds of the sales in an agreed upon manner); *Omni-Wave

Electronics Corp. v. Marshall Ind.*,127 F.R.D. 644 (D. Mass. 1989) (bailment created when

plaintiff supplied components to manufacturer to assemble into electrical products and return to

plaintiff); *California Union Ins. Co. v. City of Walnut Grove*, 857 F.Supp. 515 (S. D. Miss. 1994)

(bailment existed when clothing company supplied fabric to manufacturer who made clothing

from the fabric and returned the clothing to clothing company for sale).

    Under the terms of the Agreement, VPI provided supplies to AST West to be

manufactured into dairy sanitation products and returned to VPI or VPI's customers.  While AST

West used its formulas, capital, and labor to manufacture VPI's supplies into dairy sanitation

products,[3] the product of the identical articles delivered by VPI was to be returned to VPI.  Thus,

---

    [3] There is a suggestion in the record that AST West may have provided some of the
containers in which the dairy sanitation products were packaged.  Assuming this is true, it is
insufficient to provide AST West an ownership interest in the products.  *See, e.g., Atchison, T. &
S.F. Ry. Co. v. Schriver*, 84 P. 119 (Kan. 1906) (party supplying sacks for flour held to consent
that its relatively unimportant contribution to the final product was an accession to the
contribution of the manufacturer); 8A Am. Jur. 2d *Bailments* § 21 (1980) ("A transaction under
which goods are delivered to another to be manufactured or converted in form and which would
otherwise constitute a bailment is not changed in character so as to become a sale by the fact that
the manufacturer is to furnish additional materials, so long as the principal materials are furnished

VPI and AST West had a bailment relationship and title never vested in AST West.

It is undisputed that AST West sold Product manufactured from VPI's supplies to third parties and kept the proceeds.  A bailee's disposition of bailed property without authority constitutes conversion.  *See, e.g., Charles Bloom & Co. v. Echo Jewelers*, 279 N.J. Super. 372, 652 A.2d 1238 (App. Div. 1995) (bailee's disposition of bailed property without authority constitutes conversion); *Byer v. Canadian Bank of Commerce,* 8 Cal. 2d 297, 300-301, 65 P.2d 67 (1937) (delivery of property held in bailment to an unauthorized person is conversion just as the sale of the property or its appropriation to the bailee's own use is conversion).  The remaining question is whether Pugliese is personally liable for AST West's conversion of VPI's property.

Under New Mexico law, an officer or director of a corporation is liable in conversion if he actively participated in the conversion.  *See Lobato v. Pay Less Drug Stores, Inc.*, 261 F.2d 406, 408-09 (10th Cir. 1958) (finding in a New Mexico case that officer or agent status in corporation will not expose one to personal liability but that such status will not shield corporate actors from personal liability for wrongful acts in which they participate); *Bourgeous v. Horizon Healthcare Corp.*, 117 N.M. 434, 437, 872 P.2d 852, 855 (1994) (officers and employees of corporations can be held personally liable for intentional torts); *Stinson v. Berry*, 123 N.M. 482, 943 P.2d 129 (Ct. App. 1997) (if an officer or director directs or actively participates in the commission of the tortious act of the corporation, he or she can be held personally liable).  There is no question that Pugliese, the sole shareholder and president of AST West, actively participated in the conversion. Pugliese arranged the sale of VPI's dairy sanitation products to third parties; money from these

_____

by the other party. The title to the product remains in the party furnishing the principal materials.").

transactions was deposited into Pugliese's personal bank account; Pugliese instructed AST West employees to destroy or falsify records to conceal these sales; and Pugliese knowingly made a false written statement under threat of perjury to conceal these sales. Under these circumstances, Pugliese is personally liable for the conversion of VPI's Product.

In summary, VPI had a bailment relationship with AST West pursuant to which AST West manufactured dairy sanitation products for VPI using supplies provided by VPI and then returned the Products to VPI for sale. At all times the supplies and Products were owned by VPI and held in bailment by AST West. AST West, with the active participation of Pugliese, sold Products owned by VPI to third parties. These facts establish, as a matter of law, VPI's conversion claim against Pugliese.[4]

B.    Fraud Claim

VPI is also moving for summary judgment on its claim that Pugliese committed fraud. Under New Mexico law, fraud consists of a misrepresentation of fact, known by the maker to be untrue, made with the intent to deceive and to induce the other party to act on it, and on which the other party relies to his detriment. *Golden Cone Concepts, Inc. v. Villa Linda Mall, Ltd.*, 113 N.M. 9, 14, 820 P.2d 1323, 1328 (1991). A failure to disclose information can constitute fraud. *See, e.g., id.* at 12-13 (holding that the defendant's failure to disclose important information about low customer traffic constituted fraud sufficient to justify rescission of a contract); *Mason v.*

---

[4] Pugliese appears to assert that he is not liable for converting VPI's property because VPI had breached the Agreement by not purchasing and paying for all of the Product manufactured by AST West. Even if VPI did commit a prior breach of the Agreement, AST West's remedy was a legal action on the Agreement, not conversion of VPI's property. Pugliese has not cited, and the Court has not located, any case law holding that a prior breach of contract is a defense to a conversion action.

*Salomon*, 62 N.M. 425, 428, 311 P.2d 652, 654 (1957) (concealment is the same as an affirmative misrepresentation).

The undisputed facts establish that VPI made repeated requests for a full inventory of its supplies and Products stored and maintained at AST West's production facility, including records of any and all manufacturing activities. AST West failed to fully account for the use of VPI's supplies in the manufacture of Products. For months, AST West provided VPI with incomplete inventory reports. Pugliese directed AST West employees to conceal certain records from VPI, including batch records that showed the amount of raw materials used to make batches of Products. Pugliese also directed that falsified batch records be created and provided to VPI to account for supplies used to manufacture Products sold to third parties. Despite knowing that he had requested that AST West employees conceal and falsify batch records, Pugliese signed a written statement verifying under penalty of perjury that complete and accurate batch records had been provided to VPI.[5]

VPI has established that AST West, through its president and sole stockholder, knowingly misrepresented and concealed facts regarding its manufacturing activities with the intent to conceal the fact that AST West was selling Products to third parties and to induce VPI to continue performing under the contract. The remaining element of fraud is whether VPI relied upon the misrepresentations to its detriment. VPI has provided affidavits from Rudnick, Vice President and General Counsel for VPI, and Harold Des Jardins, President of VPI, stating that VPI invested substantial amounts of money in AST West's sales network and equipment under

---

[5] Pugliese contends that he was forced to sign this statement by VPI. Even if true, VPI certainly did not force Pugliese to falsify the batch records attached to the statement.

the belief that Pugliese and AST West were promoting VPI's catalog of dairy sanitation products and that VPI would not have continued making substantial investments in AST West had it known that AST West was undermining the deal represented by the Agreement.  Pugliese contests whether VPI's investments in AST West were "substantial."  Regardless of the amount of VPI's investment, however, it is undisputed that VPI, by continuing to perform under the Agreement, lost a significant amount of supplies as well as revenue from the unauthorized and undisclosed sale of Products.  Thus, it is clear that VPI relied to its detriment on AST West's misrepresentations.

Pugliese contends that he is not personally liable for AST West's fraud because all his actions were taken on behalf of AST West and not in his individual capacity.  The undisputed facts reveal that Pugliese, the sole shareholder and president of AST West, directly participated in the fraudulent conduct, including having the proceeds of the fraud deposited into his personal bank account.  These facts are sufficient to establish Pugliese's personal liability for the fraudulent acts.  *See U.S. v. Bestfoods*, 524 U.S. 51, 62, 118 S.Ct. 1876 (1998) (corporate veil may be pierced and the shareholder held liable for the corporation's conduct when the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf);  *Kutz Canon Oil & Gas Co. v. Harr*, 56 N.M. 358, 367, 244 P.2d 522, 527 (1952) (if corporate entity is employed as a shield to perpetrate frauds, the veil of corporate existence will be drawn aside and liability imposed on its stockholders as though there were no corporate existence);  Charles R.P. Keating & Gail O'Gradney, 1 Fletcher Cyclopedia of the Law of Private Corporations § 41.45 at 697 (1990 & Cum. Supp. 1996) (where a corporate owner directly participates in fraudulent conduct, the corporate status does not operate as a shield

16

against individual liability).

VPI has established that AST West committed fraud and that Pugliese, the sole shareholder and president of AST West, directly participated in the fraud.  Summary judgment as to liability will be granted to VPI on its claim of fraud against Pugliese.

C.      Pugliese's Contract Claims (Breach of Contract and Bad Faith)

Pugliese, in his personal capacity, asserts contract-based claims against VPI arising out of the Agreement.  VPI contests Pugliese's standing to bring contract-based claims in his personal capacity.  Pugliese signed the Agreement in his capacity as president of AST West.  He also signed the agreement, personally and individually, "solely for the purposes of binding himself with respect to the terms and conditions of Section 22 hereof, and for no other purposes."  Section 22 addresses the conditions under which Pugliese, the sole shareholder of AST West, could sell, assign, transfer, or encumber his interest in AST West.

"Standing [under Article III] is a threshold issue in every case before a federal court, and diversity claims are no exception."  *Hutchinson v. Pfeil*, 211 F.3d 515, 523 (10th Cir. 2000) (quotation omitted).  To have standing under Article III, a plaintiff must seek redress for the "'invasion of a legally protected interest.'"  *Essence, Inc. v. City of Fed. Heights*, 285 F.3d 1272, 1280 (10th Cir. 2002) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).  While Article III standing is by definition a question of federal law, state law may create the asserted legal interest upon which the federal analysis turns; indeed, "[i]f that were not so, there would not be Article III standing in most diversity cases, including run-of-the-mill contract and property disputes."  *Cantrell v. City of Long Beach*, 241 F.3d 674, 684 (9th Cir. 2001).  In this regard, New Mexico follows the general rule that one who is not a

17

party to a contract lacks standing to sue for its breach, absent a special status such as that of a third-party beneficiary, corporate successor, or assignee of a contracting party. *See, e.g.*, *Resolution Trust Corp. v. Ocotillo West Joint Venture*, 840 F. Supp. 1463, 1477 (D.N.M. 1993) ("Because Bogle was not a party to either agreement, and because there is not any indication that Bogle was intended to be a third party beneficiary, it is doubtful that Bogle would even have standing to enforce the terms of these agreements.").

With the exception of the transfer of interest provision, Pugliese, in his personal capacity, is not a party to the Agreement and all benefits and obligations arising under the Agreement pertain solely to VPI and AST West.  Pugliese is also not a third party beneficiary.  The Agreement itself explicitly states that "[t]his Agreement is for the sole benefit of the parties hereto, and no other person shall be a third party beneficiary of this Agreement or be entitled to assert any right hereunder."  Consequently, Pugliese, in his individual capacity, does not have standing to bring contract claims arising out of the Agreement other than those related to paragraph 22.  Furthermore, Pugliese's contract-based claims are virtually identical to claims brought by AST West against VPI and Rudnick in the adversary proceeding in the Bankruptcy Court, which was recently consolidated with this case.

D.     Defamation Claim

Pugliese asserts defamation claims against VPI and Rudnick arising from Rudnick's communications with the DEA and from comments allegedly made by Rudnick and a VPI employee.  VPI and Rudnick hereby move for summary judgment on Pugliese's defamation claims.

Defamation is defined in New Mexico as a wrongful and unprivileged injury to a person's

reputation.  *See* UJI 13-1001 NMRA 2002 (defining defamation).  To establish a claim of

defamation, a plaintiff must prove 1) that the defendant published a communication; 2) the

communication contains a statement of fact; 3) the communication was concerning the plaintiff; 4)

the statement of fact was false; 5) the communication was defamatory; 6) the person receiving the

communication understood it to be defamatory; 7) the defendant knew that the communication

was false or negligently failed to recognize that it was false or acted with malice; 8) the

communication proximately caused actual injury to plaintiff's reputation; and 9) the defendant

abused its privilege to publish the communication.  *See* UJI 13-1002(B) NMRA 2002 (listing

elements of defamation action).

The statements Pugliese relies upon for his defamation claims fall into the following three

categories: 1) Rudnick's communications with the DEA; 2) a comment by Sherman Levenson, a

VPI employee, to the manager of a dairy with whom AST West did business; and 3) a statement

made by Rudnick about Pugliese in front of representatives of a corporation with whom AST

West did business.

1.  Rudnick's Communications with the DEA

Pugliese asserts that Rudnick's letters to the DEA contain numerous false and defamatory

statements.  As an initial matter, Pugliese has failed to demonstrate that a single statement in

Rudnick's letters to the DEA was false.  The only incorrect statement in the communications--the

amount of hydriodic acid believed missing--was corrected in a subsequent communication the

very same day.  Even assuming, however, that any of the statements in the communications was

false, Pugliese's defamation claim would still fail on several other grounds.

First, Rudnick's statements to the DEA are privileged.  According to records provided by

AST West to VPI, a significant quantity of a controlled substance was missing.  VPI had a public

duty to inform the relevant authorities about this potentially missing substance.  Other courts have

held that statements made to law enforcement officers are covered by either an absolute privilege

or a qualified privilege.  New Mexico courts have not specifically addressed whether an absolute

or qualified privilege applies to communications to law enforcement officers.  In other contexts,

however, New Mexico has recognized a conditional privilege for good faith publication of

defamatory statements in the discharge of a public or private duty. *See, e.g., Mahona-Jojanto,*

*Inc., N.S.L. v. Bank of New Mexico,* 79 N.M. 293, 295-96, 442 P.2d 783 (1968)(a good-faith

publication in the discharge of a public or private duty when the same is legally or morally

motivated is subject to a conditional privilege);  *see also* NMSA 1978, UJI Civ. 10.23 (Repl.

Pamp.1980).  The Court thus finds that Rudnick's statements to the DEA are covered by at least

a conditional privilege.[6]

A conditional privilege, however, may be lost by abuse.  *Id.* at 295.  The privilege is

abused if a person said to be privileged lacks the belief, or reasonable grounds to believe, the truth

of the alleged defamation. *Id.* at 296; *see also* Restatement (First) of Torts § 599 (2005) ("one

who publishes defamatory matter concerning another upon an occasion giving rise to a

conditional privilege is subject to liability to the other if he abuses the privilege").  The court in

*Mahona-Jojanto* further explained that:

> Abuse arises out of the publisher's lack of belief, or reasonable grounds for belief,
> in the truth of the alleged defamation; by the publication of the material of an
> improper use; by the publication to a person not reasonably necessary for the

---

[6]  Because Rudnick's statements satisfy the qualified privilege, the Court need not
determine if New Mexico would recognize a complete immunity for statements to law
enforcement officers.

accomplishment of the purpose; or by publication not reasonably necessary to accomplish the purpose.

*Mohona-Jojanto,* 78 N.M. at 296.

Pugliese has not established that Rudnick lacked reasonable grounds to believe the truth of the statements he made to the DEA or that Rudnick published the material for an improper use. Pugliese cites a portion of a statement by one DEA agent as evidence that VPI lacked reasonable grounds to believe the truth of the statements he made to the DEA.  While the DEA agent did state that Rudnick may have been able to determine that the missing chemicals had been used to manufacture Products sold to third parties without the involvement of the DEA, he did not state that Rudnick acted in bad faith or lacked a reasonable basis for his belief that classified chemicals used in the manufacture of methamphetamine were missing and may have entered the illegal drug trade.  To the contrary, he stated in his deposition:

> Q.     Do you have any idea why Mr. Rudnick called you in on this case?
>
> * * *
>
> A.     Well, what I believed was that Mr. Rudnick was concerned about his company's liability as the owner of the product if, in fact, the product was being diverted to illicit purposes; that VPI might, you know, have some liability in that issue if they're knowingly letting their product go out to be used for the manufacture of methamphetamine.
>
> Q.     Is that what you thought when you started the investigation?
>
> A.     Yes.
>
> Q.     When you ended the investigation, did you think that was still the main purpose?
>
> * * *
>
> A.     As it went on--well, yeah, I mean, everything supported that, but just I kind of felt like Mr. Rudnick maybe was trying to use me as an agent of VPI as opposed

21

to a Drug Enforcement agent, or when it became obvious to me that it wasn't you know, a drug issue, and I told him as much, and he was wanting me to work it as a theft issue or something.  I said, You know, that's not my job, but I can refer it to somebody.

Deposition of Eric Hansen at pp. 42-43.

Pugliese also appears to assert that Rudnick's communications with the DEA were made for the improper purpose of gaining control and ownership of AST West.  Pugliese, however, has provided no evidence in support of his assertion that Rudnick's communications with the DEA were part of a conspiracy by Rudnick and VPI to gain control of AST West.  In fact, as discussed below, Pugliese has abandoned his conspiracy claim.

While some of the language used by Rudnick in the letters is improvident, Rudnick had  a good faith belief that classified chemicals were missing and that AST West was converting property belonging to VPI.  The inventory records provided by AST West to VPI revealed that some of the controlled chemicals VPI had purchased for AST West to manufacture into dairy sanitation products were missing.  Knowing that these controlled chemicals were used in the manufacture of methamphetamines and that Pugliese had a previous drug-related felony conviction, VPI contacted the DEA and accurately reported that it could not account for some of the chemicals that were purchased by VPI and provided to AST West to manufacture into dairy sanitation products.  VPI also informed the DEA that, based on information obtained by a VPI employee with access to AST West's facility, VPI believed that AST West may be making unauthorized sales of dairy sanitation products belonging to VPI to third parties.  Absent any evidence of bad faith or improper purpose, Rudnick's statements to the DEA agents are privileged and cannot provide a basis for a defamation claim.

Second, Pugliese has not come forward with any evidence that Rudnick's communications with the DEA proximately caused actual injury to Pugliese's reputation as required to state a defamation claim.  *See* UJI 13-1002(B) NMRA 2002.

Rudnick's communications to the DEA fail to establish at least three of the nine elements required to state a defamation claim.

2.  Levenson's statement

Pugliese has submitted a written statement from an employee at Wormont Dairy, which states that:

> At 5:30PM on August 5th, 2003, Sherman [Levenson] from Veterinary Pharmaceuticals stopped by Wormont Dairy to inform us that Steve Pugliese of AST West had filed bankruptcy.  As I was talking to Sherman, he said that Steve was suspected of using some of the chemicals at his plant for illegal activities, and he thought Steve would end up in prison.  I asked Sherman if he meant that Steve was involved in illegal drug activity because that was the insinuation.  Sherman did not deny or confirm the assertion but instead changed the subject.

This statement is insufficient to constitute defamation for several reasons.  First, Levinson does not make a false statement of fact.  The only factual part of the statement--that Pugliese had been suspected of using some of the chemicals at his plant for illegal activities--is a true statement. The DEA did execute a search warrant at AST West's manufacturing facility because they suspected Pugliese may have been using chemicals for illegal activities.  *See, e.g., Jaramillo v. Gonzales,* 132 N.M. 459, 467, 50 P.3d 554, 562 (N.M. App. 2002) ("truth is a complete defense to a defamation claim").   The rest of the statement--that Levinson thought Steve would end up in prison--expresses only opinion.  Statements of opinion cannot give rise to a finding of defamation. *See, e.g., Marchiondo v. Brown*., 98 N.M. 394, 400, 649 P.2d 462, 468 (1982) ("Ideas and opinions, although incorrect or faulty in their premise, are protected by the United States

constitution."). Furthermore, Pugliese does not provide any evidence that the communication caused actual injury to his reputation.

3. Rudnick's Statement to Third Parties

Pugliese alleges in an affidavit that he heard Rudnick say to third parties, including representatives of companies with whom AST West did business, that "we don't do business with thieves and liars." When asked "Are you referring to Mr. Pugliese?," Rudnick allegedly responded "Yes." Rudnick denies making this statement. Even assuming the statement was made, however, it does not meet the requirements for a defamatory statement. As discussed above, the Court has found that Pugliese converted VPI's property and created false records and made a false written statement to conceal the conversion. Thus, calling Pugliese a thief and a liar does not constitute a false statement. *See, e.g., Jaramillo v. Gonzales,* 132 N.M. at 467 ("truth is a complete defense to a defamation claim"). Furthermore, Pugliese has not provided any evidence that the statement caused actual injury to his reputation.

The statements cited by Pugliese do not meet the requirements for a defamation claim and summary judgment will be granted in favor of Rudnick and VPI on Pugliese's defamation claims.

E.    Conspiracy Claim

Rudnick and VPI move for summary judgment on Pugliese's claim that Rudnick and VPI conspired to take control and ownership of AST West by breaching the Agreement and violating the covenant of good faith and fair dealing. In his response, Pugliese does not address his conspiracy claim and this claim will be deemed abandoned.

F.    *Prima Facie* Tort Claim

Pugliese alleges that VPI and Rudnick's complaints to the DEA, which resulted in a DEA

24

investigation of Pugliese, were part of a conspiracy to take over AST West and constitute a *prima facie* tort claim.  To state a claim for *prima facie* tort, a plaintiff must show (1) an intentional, lawful act by defendant, (2) an intent to injure the plaintiff, (3) injury to plaintiff, and (4) insufficient justification for the defendant's acts.  *Schmitz v. Smentowski*, 109 N.M. 386, 394, 785 P.2d 726, 734 (1990) (citation omitted).  *Prima facie* tort is intended to provide a remedy for persons harmed by acts that are intentional and malicious, but otherwise lawful, which "fall outside of the rigid traditional intentional tort categories."  *Martinez v. N. Rio Arriba Elec. Coop., Inc.*, 2002-NMCA-083, ¶ 24, 132 N.M. 510, 51 P.3d 1164 (internal quotation marks and citation omitted).  *Prima facie* tort should be used to address wrongs that otherwise "escape categorization," but "should not be used to evade stringent requirements of other established doctrines of law."  *Schmitz*, 109 N.M. at 396 & 398.

New Mexico courts have accepted the view that *prima facie* tort may be pleaded in the alternative. *See id.* at 396.  "[H]owever, if at the close of the evidence, plaintiff's proof is susceptible to submission under one of the accepted categories of tort, the action should be submitted . . . on that cause and not under *prima facie* tort." *Id.*  While Pugliese's claims for defamation and *prima facie* tort arise out of the same conduct, the two claims are arguably distinct.  Pugliese alleges that VPI and Rudnick conspired to gain control and ownership of AST West and defamed him and complained to the DEA as a means toward that end.  Thus, Pugliese's *prima facie* tort claim goes beyond simple defamation and amounts to deliberate injury in furtherance of an illegal scheme.

It is Pugliese's burden to come forward with competent evidence to establish the elements of his *prima facie* tort claim.  In his opposition, Pugliese devotes a total of two sentences to this

claim, the first of which inappropriately seeks to shift the burden to VPI to prove that disputed

material facts exist that preclude summary judgment.  In his second sentence, Pugliese states,

without citation to the record, that "[t]he facts set out in the above statement, taken as a whole,

arise [sic] a factual issue as to whether VPI and Rudnick deliberately mislead [sic] law

enforcement officers and others to accomplish their plan to take over AST West's business."

   Pugliese has shown that Rudnick and VPI, by contacting the DEA with their concerns

regarding the controlled substances that were unaccounted for in AST West's batch records,

committed an intentional, lawful act in satisfaction of the first element of a *prima facie* tort claim.

Pugliese, however, has failed to satisfy the remaining three elements of a *prima facie* tort claim.

Pugliese has provided no evidence that VPI or Rudnick intended to injure Pugliese by making

these communications.  In fact, as discussed above, Pugliese has provided no evidence of a

conspiracy between VPI and Rudnick to obtain control over AST West, the alleged motive for

Rudnick's communications with the DEA.  Pugliese has provided no evidence that he suffered any

injury from Rudnick's communications with the DEA and, finally, the Court has found that there

was sufficient justification for Rudnick's communications with the DEA.

   Pugliese has failed to come forward with evidence to support his *prima facie* tort claim

and summary judgment will be granted on this claim in favor of VPI and Rudnick.

## CONCLUSION

   **IT IS HEREBY ORDERED** that Plaintiff's Motion for Partial Summary Judgment as to

Liability Regarding Veterinary Pharmaceuticals, Inc.'s Conversion and Fraud Claims, and Motion

for Summary Judgment as to all Counterclaims and All Third Party Claims, filed October 1, 2004,

**[Doc. No. 76]**, is **GRANTED.**  Summary judgment as to liability is hereby granted in favor of

26

Plaintiff Veterinary Pharmaceuticals, Inc., on its conversion and fraud claims.  Summary judgment is also granted in favor of Plaintiff Veterinary Pharmaceuticals, Inc., on Pugliese's counterclaims of breach of contract, bad faith, defamation, and *prima facie* tort.

Summary judgment is granted in favor of Third Party Defendant Daniel L. Rudnick on Pugliese's claims asserting civil conspiracy, defamation, and *prima facie* tort.

Dated this 28th day of Septembert, 2005.

_____
MARTHA VAZQUEZ
U. S. DISTRICT COURT JUDGE

Attorneys for Plaintiff/Third Party Defendant:
      Julie J. Vargas, Esq.
      Rodolfo Parga, Jr., Esq.

Attorneys for Defendants:
      Russell C. Lowe, Esq.
      Paul D. Barber, Esq.